**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cr-20252-JTF** |
| | ) | |
| **JEREMY NOEL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS

Before the Court is Defendant Jeremy Noel's Motion to Suppress, filed February 17, 2023. (ECF No. 21.) District Judge John T. Fowlkes, Jr. referred the motion to the undersigned for report and recommendation. (ECF No. 22.) The United States responded in opposition on February 28, 2023. (ECF No. 23.)

The Court held a hearing on April 12, 2023. (ECF No. 26.) At the hearing, the United States called one witness, Officer Dustin Beard, and introduced into evidence two exhibits: a street map (Exhibit 1) and a disc containing a video file from a body-worn camera (Exhibit 2). Noel called no witnesses and introduced no exhibits.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, the Court recommends that the motion be denied.

## PROPOSED FINDINGS OF FACT

The following proposed facts are taken from the sworn testimony presented at the suppression hearing. Where factual conflicts were presented, these facts represent the

undersigned's resolution of those conflicts after considering the credibility of the witness and supporting evidence.

Officer Beard is employed by the Memphis Police Department, serving on a Task Force Unit out of the Airways Station. He has been so employed for eight years, including at the time of the relevant events. On October 8, 2020, Officer Beard was driving his patrol car with his partner, Officer Lucas, responding to a call arising from a traffic stop that occurred at Elvis Presley Boulevard and Eloise Road. The officers received information from another officer in their unit, Officer Lemon, that he had attempted a traffic stop but that the vehicle—a four-door, white vehicle driven by a Black male—had fled from the scene and headed south. Officer Beard testified that Officer Lemon did not provide the make, model, year, or any other details about the vehicle, and he conceded that many cars fit the general description of a white, four-door vehicle. The entire unit, as well as additional officers, was searching for the car, and other patrol vehicles were in the area with their lights and sirens activated. Officer Beard testified that locating the white vehicle was his main objective.

Officers Beard and Lucas approached the area driving eastbound on East Mallory Avenue, a street that becomes Norris Road just west of the Interstate 240 overpass. To the east of Interstate 240, the street continues as Norris Road, with East Mallory picking back up as a parallel street two blocks north of Norris. (Ex. 1.) As the officers continued eastbound on Norris heading toward Elvis Presley, they saw a Black male (Noel) driving a four-door, white car westbound on Norris. Noel turned right (northbound) on Pratt Street, and Officer Beard testified that the officers saw that Noel was driving without wearing a seatbelt—Officer Beard testified that Noel's car windows were not tinted, that he could see right into the car, and that he had a clear view of the driver.

2

Officer Beard followed Noel onto Pratt and activated his blue lights to make a traffic stop. Officer Beard testified that he did not activate his blue lights immediately upon seeing the white car and instead initiated the traffic stop in the "middle section" of Pratt between Norris and East Mallory. Officer Beard's bodycam video shows, however, that Noel is parked near the north end of Pratt, as a stop sign and the cross-street of East Mallory are visible in front of his car. (Ex. 2.) Officer Beard also testified that the arrest ticket, which was not entered into evidence, gave an address of 2196 Pratt as the site of arrest, which he described as being closer to the intersection of Pratt and East Mallory. Officer Beard clarified, however, that this location is where Noel eventually stopped after Beard had previously activated his blue lights, implying that Noel continued to drive on Pratt for some distance after the blue lights came on, before coming to a stop.

Officer Beard's bodycam captured some of the interaction. (Ex. 2.) Officer Beard testified that the first minute of the video does not contain audio due to the one-minute buffer that occurs before the camera activates. The bodycam footage also does not begin when Officer Beard initiated his blue lights; Officer Beard testified that it should have but was not synced properly. In addition, Officer Beard testified that, upon initiating his blue lights, his dash camera should have activated as well, and he did not know why no dash camera footage is available in this case. Officer Beard further testified that he initially learned of the white, four-door car from Officer Lemon over the radio, but the United States has been unable to find evidence of that dispatch communication either.

The dashcam video begins as Officer Beard is already standing next to Noel's car, a white, four-door sedan. Officer Beard is standing on the driver's side, and Officer Lucas is on the passenger side. Noel can be seen in the driver's seat, not wearing a seatbelt. As the officers

begin to interact with Noel, he holds his hands up, and Officer Beard appears to lean in to look into the car.  Officer Beard testified he asked Noel for identification, but Noel did not have any, and he explained to Noel that he was being pulled over because he was not wearing a seatbelt. Officer Beard saw a baggy of pills inside the car by the steering column, and he could smell the odor of marijuana coming from the car.  The officers asked Noel if he had a weapon, and Noel responded that he had a weapon in his waistband.

The video shows that Noel then opens his door to get out of the car, and Officer Beard takes hold of Noel's right shoulder with his left hand and then takes Noel's left wrist in his right hand.  Officer Beard testified that Noel was being cooperative in letting him know where the gun was, and he grabbed Noel's hand to let Noel know not to touch the gun.  Officer Lucas is seen in possession of the firearm, and as the audio recording begins, Officer Beard pats Noel down and places him in the back of the patrol car.  Officer Beard then begins to search Noel's car.

Other officers—Westrich and Bartlett—arrive shortly thereafter.  Officer Beard asks Officer Westrich if Noel's car is the original white vehicle they had been looking for, and Westrich says it is not—that vehicle went in a different direction.  Officer Beard does not tell Officer Westrich at this point that he pulled Noel over for not wearing a seatbelt.  Officer Beard tells Officer Westrich about the gun and pills they had found, and they continue to search Noel's car, recovering additional suspected narcotics.  Officer Lemon eventually arrives as well, and Officer Beard tells him, "I told Lucas, I got to get that one. . . .  I thought that was y'all's car." Officer Lemon responds, "Man, it's close . . . maybe it was our car," which Officer Beard testified was a joke.  Officer Beard testified that he learned at that time that the original white vehicle had not been found.  One of the other officers indicates that Noel had previously been convicted of a felony.

The officers tagged the gun and drugs recovered from Noel and his car and transported Noel to jail.  Upon arrival at the facility, Noel asks Officer Beard why he was stopped, saying that the officers had their blue lights on coming over the expressway.  Officer Beard responds that they did not have their blue lights on and that they had seen Noel turn without a seatbelt on, and then they turned the lights on.  Noel reiterates that he saw them "flying" from the expressway with the blue lights on, which Officer Beard again denies.

On October 27, 2022, a federal grand jury returned an indictment charging Noel with knowingly possessing a firearm while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

## PROPOSED CONCLUSIONS OF LAW

Noel seeks suppression of the fruits of an illegal stop and search unsupported by probable cause.  "The government has the burden of proving the legality of a warrantless search." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (citing *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002)).

## I.    Probable Cause for the Stop

The officers had probable cause to stop Noel because they saw that he was driving while not wearing a seatbelt.  "The stop of a vehicle qualifies as the 'seizure' of a 'person' that must be 'reasonable' under the Fourth Amendment." *United States v. Brooks*, 987 F.3d 593, 598 (6th Cir. 2021) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)).  Sixth Circuit authority "permit[s] vehicle stops based on a mere 'reasonable suspicion' that a felony has occurred or that a misdemeanor is occurring, analogizing these temporary stops to the well-known '*Terry* stop.'" *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Collazo*, 818 F.3d 247, 253–54 (6th

Cir. 2016)).  Noel concedes that the failure to wear a seatbelt is a misdemeanor under Tennessee

law and thus that the reasonable-suspicion standard applies.  *See* Tenn. Code Ann. § 55-9-603.

Regardless, "an officer has probable cause if the officer sees an individual in the vehicle not

wearing a seatbelt in violation of state law."  *Brooks*, 987 F.3d at 598.  Moreover, "officers may

stop a car as long as they objectively have probable cause that an occupant of the car has

committed a traffic offense, even if they subjectively do so for a different reason."  *Id.* at 599

(citing *Whren*, 517 U.S. at 811–16).  Thus, as Noel acknowledges, Officer Beard's subjective

reason for stopping Noel is irrelevant so long as Officer Beard actually saw the seatbelt

infraction before pulling Noel over.

The dispute on this issue is a factual one: whether the officers actually saw that Noel was

not wearing a seatbelt before they stopped him, or whether they instead stopped him because

they were looking for a white, four-door vehicle and only realized that Noel was not wearing a

seatbelt after they pulled him over.  The Court makes that credibility determination based on a

preponderance-of-the-evidence standard.  *See United States v. Jones*, 128 F. App'x 490, 493 (6th

Cir. 2005) (citing *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)).  "In assessing credibility, a

court considers numerous factors, ultimately relying on the common sense tests of reason and

logic."  *United States v. Vaughn*, 429 F. Supp. 3d 499, 529 (E.D. Tenn. 2019) (quoting *United

States v. Caldwell*, No. 1:13-cr-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015)).

The United States established by a preponderance of the evidence that Officer Beard saw

that Noel was not wearing a seatbelt before he pulled him over.  Officer Beard's testimony on

that point was unequivocal.  He stated multiple times that he saw, as Noel took the right turn

onto Pratt, that Noel was not wearing a seatbelt.  He testified that he could clearly see Noel

through the untinted windows of his car.  Officer Beard testified that he and Noel were traveling

6

in opposite directions and were both sitting in the driver's seats of their cars, lending credibility to his testimony that he had a direct view of Noel as Noel approached him on Norris and then turned right on Pratt.

Noel points to a number of facts in an attempt to call Officer Beard's testimony into question. Noel first notes the lack of corroborating evidence—the United States produced no dash camera footage or dispatch records, and Officer Beard's bodycam apparently malfunctioned and did not begin recording until he had already pulled Noel over. Though such corroboration might have been helpful or even determinative, it is not necessary to credit Officer Beard's testimony. Absent indication of some impropriety in failing to disclose such evidence, this argument is unavailing.

Next, Noel highlights that he was stopped near the north end of Pratt, arguing that Officer Beard would have stopped him immediately after turning onto Pratt if he had actually seen that Noel was not wearing his seatbelt, or that Noel was able to proceed so far on Pratt because Officer Beard was not close when Noel turned right onto Pratt—too far to be able to see whether Noel was wearing his seatbelt. But Officer Beard testified that he did not initiate his blue lights until Noel had reached the middle section of that stretch of Pratt and that Noel did not come to a full stop until near its end. That testimony was reasonable and credible; the map introduced by the United States shows that the length of Pratt at issue is not great. (*See* Ex. 1.) It is reasonable to believe that Noel was able to travel the distance on Pratt during the time it took Officer Beard to turn left onto Pratt, initiate his blue lights, and allow Noel to come to a complete stop.

Noel also questions the credibility of Officer Beard's testimony by pointing to his bodycam-recorded conversation with Officer Beard as he was transported to jail, in which he stated that the patrol car had come "flying" towards him with its blue lights activated. That same

bodycam footage also shows Officer Beard immediately refuting Noel's contention, however, and reiterating that he initiated his blue lights when he saw Noel was not wearing a seatbelt. Officer Beard also testified that other taskforce members were patrolling the area with their lights and sirens activated, so it is possible that Noel saw a different patrol car with lights on before he was stopped by Officer Beard.

Finally, Noel relies on Officer Beard's subjective intent in stopping him because he was driving a white car. Officer Beard emphatically denied on cross examination that he pulled Noel over only because he was driving a white car. He candidly testified that he was actively looking for a white, four-door vehicle, but he also credibly testified that he saw that Noel was not wearing a seat belt before he initiated the traffic stop. Thus, even if Officer Beard's attention was initially drawn to Noel because his car resembled the subject of the unit's search, he had probable cause to stop Noel because he could see that Noel was not wearing a seatbelt.

Officer Beard's stop of Noel was consistent with the Fourth Amendment because he observed the misdemeanor seatbelt violation, and thus it is recommended that the motion to suppress be denied.

## II.    Reasonable Suspicion for the Stop

The United States argues that, even if the officers had not seen that Noel was not wearing a seatbelt, they had reasonable suspicion to stop him because his car resembled the vehicle they were pursuing. Investigative stops of moving vehicles are governed by *Terry*. *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)); *see also United States v. Galaviz*, 645 F.3d 347, 352–53 (6th Cir. 2011). "The Fourth Amendment's prohibition on 'unreasonable . . . seizures' allows temporary investigative detentions, known as *Terry* stops, so long as there is 'a reasonable suspicion supported by

articulable facts that criminal activity may be afoot.'" *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting U.S. Const. amend. IV; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

The "reasonable suspicion" required to justify a *Terry* stop is "an 'elusive' concept, one that 'is not readily, or even usefully, reduced to a neat set of legal rules.'" *McCallister*, 39 F.4th at 373 (quoting *Sokolow*, 490 U.S. at 10).  Case law has established, however, that the "'degree of suspicion' required . . . is quite low: 'a moderate chance of finding evidence of wrongdoing.'" *Id.* (quoting *Sokolow*, 490 U.S. at 10; *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71 (2009)).  That "modest bar" requires only "a suspicion that is 'particularized' (tailored to a specific person) and 'objective' (based on more than a hunch) under the totality of the circumstances known to the officer." *United States v. Faught*, – F.4th –, 2022 WL 2813240, at *3 (6th Cir. July 19, 2022), *petition for cert. filed*, No. 22-6334 (Dec. 13, 2022) (citing *Sokolow*, 490 U.S. at 7; *Kansas v. Glover*, 589 U.S. –, 140 S. Ct. 1183, 1187 (2020)).  "That includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers." *McCallister*, 39 F.4th at 374 (citing *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008)).

The United States relies on two cases, *Hurst* and *Galaviz*, to support its argument that the officers had reasonable suspicion to stop Noel's car because they were looking for a white, four-door vehicle in the same area.  Both cases, however, are distinguishable.  In *Hurst*, the victim of a home burglary reported that he saw a dark-colored Thunderbird in his driveway.  228 F.3d at 755.  Soon after, an officer saw a dark blue Mercury Cougar in the area, a car "similar in appearance to a Thunderbird," traveling at high speed, and officers ultimately pulled the Cougar over. *Id.*  The court found the officers had reasonable suspicion to stop the Cougar based on the

totality of the circumstances—it "roughly match[ed] the appearance" of the car seen at the burglary, it was seen in the same vicinity as the burglary a short time after, and it was traveling away from the site of the burglary at high speed. *Id.* at 757.

Similarly, in *Galaviz*, the victim of a robbery reported that the perpetrator, "a black male and/or a black female," left the scene in a "white car." 645 F.3d at 351. About ten minutes later, an officer posted approximately two miles from the site of the robbery saw a white Lincoln Town Car stopped at a traffic light. *Id.* The officer drove past the Lincoln and then turned around to follow it, at which point the Lincoln accelerated away from him at high speed. *Id.* The court found the officer had reasonable suspicion to stop the Lincoln, again based on the totality of the circumstances: "the color and location of his car and the time of the encounter relative to the time of the reported robbery, as well as [the officer's] perception that Galaviz accelerated away from him at a speed in excess of the posted speed limit." *Id.* at 353 n.5 (citing *Hurst*, 228 F.3d at 756–57).

The requisite articulable facts sufficient to create reasonable suspicion in *Hurst* and *Galaviz* are not present in this case. The description of the vehicle in *Hurst*—a dark-colored Thunderbird—is much more particularized than the "white, four-door vehicle" description given to Officer Beard. That description is highly generic and likely applied to many cars on the road that day. Though the description of a "white car" in *Galaviz* was similarly nonspecific, the defendant in that case accelerated quickly when the officer began to follow him, a fact that greatly increases the reasonableness of the officer's suspicion. Here, nothing about Noel's actions was inherently suspicious. He was simply a Black male driving a white, four-door car in

the same area[1] as Officer Lemon's aborted traffic stop.[2] Those details do not create the reasonable suspicion necessary to justify pulling Noel over. Thus, had Officer Beard not seen that Noel was not wearing a seatbelt, he would have lacked a basis for stopping Noel. Given the Court's determination that Officer Beard did, however, observe the infraction, it is recommended that the motion to suppress be denied.

## RECOMMENDATION

For the foregoing reasons, this Court recommends the motion to suppress be denied.

Respectfully submitted this 13th day of June, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.

---

[1] The location where the officers first saw Noel's car comports with the information they received from Officer Lemon—if the suspect who fled from Officer Lemon's traffic stop had traveled south on Elvis Presley Boulevard, the driver could have then turned right and headed westbound on Norris Road. (*See* Ex. 1.)

[2] No evidence was presented at the hearing as to how much time passed between Officer Lemon's traffic stop and the stop of Noel, but Officer Beard's testimony that he and his entire unit were responding to Officer Lemon's call tends to indicate that it was soon after.